UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――― :
INDYMAC BANK, F.S.B.,                                     :     Case No.: 07 cv 6865 (LTS)(GWG)
                                                                          :
                    Plaintiff,                                        :
                                                                          :     **MEMORANDUM OF LAW**
    – against –                                                    :
                                                                          :
NATIONAL SETTLEMENT AGENCY, INC.;    :
STEVEN M. LEFF; RACHEL M. LEFF; RICHARD
A. LEFF; and OPTAMERICA MORTGAGE, INC.,    :
                                                                          :
                    Defendants.                                   :
                                                                          :
――――――――――――――――――――――――――

      IndyMac Bank, F.S.B. ("IndyMac") respectfully submits this memorandum of law in support of its motion for turnover (or alternatively, judgment) against nonparties 180 Madison Owners, LLC and Sitt Asset Management, LLC.

### Background and Undisputed Facts

      Sitt Asset Management is the managing agent for the commercial property located at 180 Madison Avenue, owned by 180 Madison Owners, LLC (collectively, the "Landlord"). Landlord and defendant National Settlement Agency, Inc. ("NSA") entered into a commercial lease in April 2007 (the "Lease"), which includes Suites 1200, 1201 and 1203 plus hallway space. Concurrent with signing the Lease, on April 18, 2007, NSA advanced $25,100.00 and $3,253.34 for the first-due monthly rents for Suites 1203 and 1201, respectively; and, NSA placed $100,400.00 and $13,013.34 on deposit as security for Suites 1203 and 1201, respectively. Thus, total deposits of $125,500.00 and $16,266.68 were made, respectively, for Suites 1203 and 1201, totaling in all $141,766.68. *Landlord did not deposit the checks into a segregated account, opting instead to deposit them into a general operating account*.

Landlord never delivered possession of Suites 1200 and 1201 or the hallway space. As for Suite 1203, Landlord permitted entry to an NSA-hired contractor to make alterations. Work began on May 10, 2007. The contractor walked off the job two months later, on July 9th. Landlord neither delivered the keys, nor (apparently) provided a notice of commencement, to NSA.

On August 16, 2007, IndyMac obtained from this Court an Order of Attachment against all the assets belonging to NSA, up to $2,349,150.00. NSA having failed to appear or otherwise respond to the complaint, a judgment in that amount was entered against NSA (on default), on December 20th.

While engaging in discovery against the other defendants, IndyMac learned that NSA had given a security deposit on a commercial rental space that it never occupied. On October 11, 2007, IndyMac levied against **all of NSA's assets** by causing the U.S. Marshal to serve the Order of Attachment upon Landlord, as garnishee. That same day (presumably after being served with the Order of Attachment, or just by coincidence), Landlord commenced a summary non-payment proceeding against NSA in New York County Civil Court. NSA apparently defaulted. It is unclear whether Landlord obtained a judgment; and if so, whether it is purely possessory, or includes a monetary component. It is also unclear whether Landlord ever served a notice of eviction, or any other type of notice, upon NSA.

IndyMac perfected the levy against Landlord, by filing an order to show cause on January 8, 2008 (within 90 days of the levy). Landlord responded, *inter alia*, that NSA had paid them $141,766.68, amounting to first-month's rent and security for the premises, which amount should be set off against the amounts supposedly owed under the Lease. IndyMac and Landlord

appeared before this Court on January 29, 2008. The parties agreed, and this Court directed, that if the matter could not be settled, IndyMac would move by notice of motion.

**Basis for this Motion**

IndyMac brings this motion under Rules 64 and 69 of the Federal Rules of Civil Procedure. The former addresses provisional and final remedies (*i.e.*, attachment and garnishment), and the latter addresses enforcement of a money judgment. Both rules incorporate the procedures of the state where the court is located—in this case, New York State's Civil Practice Law and Rules ("CPLR"). Under CPLR § 5225(b), the Court may require Landlord to pay money to the judgment creditor (here, IndyMac). Alternatively, under CPLR § 5227, the Court may enter judgment against a person (here, Landlord) who is shown to be (or to become) indebted to the judgment debtor (NSA), to pay the judgment creditor.

**Argument**

I. **Landlord Commingled the Funds in Violation of New York Law, and Forfeited Any Right to the Funds for Any Purpose**

Under New York law, "A landlord holding a security deposit under a lease covering the rental of real property does so in the capacity of a trustee" for the benefit of the tenant. *Glass v. Janbach Properties, Inc.*, 73 A.D.2d 106, 110, 425 N.Y.S.2d 343, 345 (2d Dept. 1980). This obligation is clearly spelled out by statue:

> Whenever money shall be deposited or advanced on a contract or license agreement for the use or rental of real property as security for performance of the contract or agreement or to be applied to payments upon such contract or agreement when due, such money, with interest accruing thereon, if any, until repaid or so applied, shall continue to be the money of the person making such deposit or advance and shall be held in trust by the person with whom such deposit or advance shall be made and shall not be mingled with the

3

> personal moneys or become an asset of the person receiving the same.

N.Y. Gen. Oblig. Law § 7-103(1); *see also, Fore Improvement Corp. v. Selig*, 278 F.2d 143, 146 (2d Cir. 1960) (the security deposit law "is emphatic in its language and is declarative of the public policy of New York State" and "such statutes frequently have to be literally construed to obtain the desired compliance").

Just as the rule prohibiting a landlord from commingling a security deposit with his own funds is clear, so is the consequence of noncompliance: "Commingling entitles a tenant to an immediate return of the deposit because the landlord who has converted the funds forfeits his right to security."  *Glass, supra,* 73 A.D.2d at 110, 425 N.Y.S.2d at 345; *accord*, *Matter of Perfection Tech. Servs. Press, Inc.*, 22 A.D.2d 352, 356, 256 N.Y.S.2d 166, 169 (2d Dep't 1965), *aff'd without opinion*, 18 N.Y.2d 644, 219 N.E.2d 424, 273 N.Y.S.2d 71 (1966).

A tenant's failure to comply with the terms of a lease is not a defense to a landlord's breach of the duty not to commingle the deposit with personal funds. *See LeRoy v. Sayers*, 217 A.D.2d 63, 68, 635 N.Y.S.2d 217, 221 (1st Dep't 1995) (granting summary judgment against landlord).

The statute transformed the relationship between a lessor and lessee into one of trust. *Mallory Assocs., Inc. v. Barving Realty Co.*, 300 N.Y.2d 297, 301-02, 90 N.E.2d 468, 471 (1949).  The Appellate Division, Second Department, explained:

> The [security deposit law] changed the legal relationship between the [landlord and tenant] from debtor-creditor to trustee-*cestui que* trust.  The inability of the commingling landlord to set off claims against the deposit flows from the change in his legal status.  [The landlord] does not owe a debt as he once did; he owes a duty not to commingle the deposit with his own funds.  Upon a breach of that duty, he forfeits his right to avail himself of the deposit for any purpose.  To allow him to set off the deposit against his individual claims is to treat the deposit as a debt . . .

4

*Matter of Perfection, supra,* 22 A.D.2d at 356, 256 N.Y.S.2d at 169. The tenant, as trust beneficiary, has a claim for conversion against the landlord, as trustee. *Id*. Any debtor-creditor analysis is inapplicable.

Here, it is undisputed that Landlord commingled the funds, in violation of New York law. As a result, Landlord forfeited any rights to avail itself of the funds, and must turn over the funds to IndyMac, the judgment creditor.

**II.     There are No Set Off Rights, Because the Lease Term Never Commenced**

Although this is a straightforward case in light of Landlord's commingling, IndyMac nevertheless sets forth an alternative argument, so as not to waive it. Assuming Landlord did not forfeit all rights to the security deposit funds, Landlord still is not entitled to a set off, because Landlord never delivered possession of the premises.

**A.  Suite 1203**

Article 2 of the lease agreement[1] provides that the term of the lease upon Suite 1203 "shall commence on the date Landlord delivers the Suite 1203 Premises to Tenant with Landlord's Work Substantially completed (the 'Commencement Date') . . . ." Article 2 goes on to state that "Landlord expects the Commencement Date to be on or about July 1, 2007. However, in the event the Commencement Date shall not occur by October 1, 2007, other than due to no fault on Landlord's part, then the sixty (60) day Fixed Rent abatement set forth in Article 3.02 herein shall be extended on a day-for-day basis by one day for each day after October 1, 2007, that the Commencement Date is delayed. Landlord agrees to provide fifteen (15) day prior written notice to Tenant of the Commencement Date." Lease, p. 2.

---

[1] A copy of the Lease is attached to the Affidavit of Mary Jean Rose in opposition to IndyMac's original order to show cause (Docket no. 61).

Landlord neither delivered possession, nor provided written notice of commencement, to NSA. Therefore, the term on Suite 1203—and the associated rental obligation—never began. Accordingly, the money advanced and put on deposit for Suite 1203 ($125,500.00) was and remains the property of NSA.

Even if the lease term began on July 1, 2007, the nonpayment proceeding was in violation of the lease. Article 3.02 of the lease agreement provides, "so long as Tenant is *not in default* under this Lease, Tenant shall receive an abatement of Fixed Rent for the Suite 1203 Premises . . . beginning on the Commencement Date and ending . . . [60 days] after the Commencement Date." Lease, p. 3 (emphasis added). Article 3.01 of the lease states that rent "shall be payable in equal monthly installments in advance on the first (1st) day of each calendar month during the Term." Lease, p. 3.

Again assuming that the term commenced on July 1, 2007, NSA did not owe any rental payments until October 1, 2007: the 60-day rent abatement, plus the $25,100 advanced as first month's rent, accounted for the July, August, and September rental payments. Accordingly, Landlord's purported, September 24, 2007 "Demand for Rent" was premature and improper. Under Article 5 of the lease, Landlord should have waited until the October 1, 2007, at which time it could have sent a five-day's cure-notice for rent, at the expiration of which a failure to pay would then constitute default under the lease. Lease, p. 9.

In sum, Landlord cannot in good conscience apply (set off) the alleged rents owed, or any possible money judgment, when they knew the proceeding they initiated was improper and without basis under the lease agreement.

### B. Suite 1201

The $16,266.68 advanced and deposited for Suite 1201 ($3,253.34 advanced rent and $13,013.34 security deposit) remains the property of NSA. Article 1 of the Lease states that the Suite 1201 term commences upon delivery of possession of Suite 1201, which is contingent upon surrender of that premises by an existing tenant ("Suite 1201 Commencement Date"). Article 31 provides that "*[u]pon the Suite 1201 Commencement Date*, Tenant shall deposit with Landlord the additional sum of $13,013.34 as additional security for the performance of Tenant's obligations accruing under the Lease . . . ." This provision indicates the parties' intent that the application of this deposit may only be made against Tenant's obligations that accrue *after* the Suite 1201 Commencement Date, since the additional deposit was required after the Suite 1201 Commencement Date.

Landlord concedes they never delivered possession of Suite 1201 to NSA. Because this contingency did not happen, the $16,266.68 advanced and deposited for Suite 1201 remains the property of NSA. Indeed, Article 1 of the Lease provides that if the Landlord is unable to deliver possession of Suite 1201 by November 1, 2007, either party may, by a ten-day written notice, nullify and void "the provisions of this Lease relating to [Suite 1201]." Neither party gave notice to the other. Twenty days earlier (on October 11th), Landlord filed their non-payment proceeding seeking to evict NSA. Because this proceeding was commenced before Suite 1201 was delivered, and before November 1, 2007 (the date upon which NSA could act to nullify the provisions of the lease relating to Suite 1201), the commencement of the proceeding for eviction constitutes Landlord's nullification of the Suite 1201 provisions—indeed, a termination of the entire Lease contract. Accordingly, all funds advanced and deposited on Suite 1201 should be returned.

Landlord will likely argue that the default provision of Article 5.02 entitles them to retain the amounts advanced and deposited for Suite 1201, notwithstanding the fact that Suite 1201 was never delivered. Article 5.02 states that "[i]n the event that Tenant is in arrears for Fixed Annual Rent . . . Tenant waives its right, if any, to designate the items against which *payments* made by Tenant are to be credited and Landlord may apply any *payments* made by Tenant to any items which Landlord in its sole discretion may elect . . . ." Lease, p. 10 (emphasis added). The $13,013.34 *deposited* on Suite 1201 and the $3,253.34 *advanced* for the first month's rent on Suite 1201 are not *payments* within the ambit of Article 5.02 for the simple reason that the advance and deposit remained NSA's property. In fact, the ledger for Suite 1201 reflects this fact in that it does not list the $3,253.34 advanced rent as an accrued charge.[2] To the extent that Article 5.02 is meant to be interpreted any other way, it is in conflict with NY Gen. Oblig. Law §7-103(1), and is therefore void under §7-103(3).

## Conclusion

Money advanced or deposited for the lease of real property remains the property of the tenant, with the landlord under the paramount obligation to keep that money in trust until it is repaid to the lessee or is applied in accordance with the terms of the lease. As a trustee of NSA's advanced rental payments and security deposit, Landlord was obligated to keep them in trust and to strictly abide by the lease terms before retaining any of that money as its own. Landlord failed to do so. All money advanced and deposited by NSA therefore remains the property of NSA and should be forfeited to the U.S. Marshal pursuant to IndyMac's Order of Attachment and prior

---

[2] A copy of the Lease is attached to the Affidavit of Mary Jean Rose in opposition to IndyMac's original order to show cause (Docket no. 61).

levy; or alternatively, paid directly to IndyMac pursuant to CPLR 5225(b) or 5227, with interest thereon.

Dated: New York, New York
       March 11, 2008

                                          **FELDMAN WEINSTEIN & SMITH LLP**
                                          Attorneys for IndyMac Bank, F.S.B.

                           By:    s/Eric Weinstein_____
                                          Eric Weinstein (EW 5423)
                                          David J. Galalis (DG 1654)
                                          Yong Hak Kim (of counsel)
                                          420 Lexington Avenue, Ste. 2620
                                          New York, NY 10170
                                          (212) 869-7000